1756, Congregation Jesuit Israel versus Congregation Shari Israel. Just let everyone be seated and then we'll hear you. Thank you. All right, proceed. I may please the Court. I'm Lou Solomon with me at Council Table. Mr. Chairman, my colleague from Rhode Island, and Ms. Savitt, my colleague from New York. The issue on the appeal, and as to which, with the Court's permission, I would like to reserve four minutes and rebuttal.           Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. The appeal section of our minutes involves these intimately related Jewish religious items, the synagogue in Newport called the Tour au Synagogue, and the bells or rimonim or finials that adorn the Torah that the District Court found were essential to the religious ceremonies of Tour au Synagogue and became part of the heritage of the Jews of Newport 250 years ago. Other than the time that the rimonim, as part of a mixed pair, were with Sheriff Israel in New York, these rimonim, these finials, have been part and parcel, integral parts of the service at the Tour au Synagogue. It's Sheriff Israel's position that that's where they should remain. Our position is not based on religion, it's not based on equities, it's not based on social law, and it's that that I would like to address. The District Court found that although CJI, the plaintiff here, did not exist before 1893, it not only had possession of the rimonim as part of its possession of the Tour au Synagogue, but the District Court found it owned them outright and, in his words, could do whatever it wanted with them. The District Court found that the Tour au Synagogue itself was held in trust by Sheriff Israel, the New York Synagogue. He found that based on use of the language for the use of the Jewish community that was in an 18th century will, a rule we do not challenge. The same language, however, for the use of the Jewish community is in the very document that the District Court found gave Jesuit Israel the right to use the rimonim. Counsel, for purposes of your appeal, you have accepted the District Court's finding that you all acted as a charitable trustee, that you had some, that was your status, at least as to the cathedral, if not as to the rimonim, but I want to ask you something, and it may be that you want to consult with your clients and reply by letter rather than doing so in court. There is an amicus brief filed in this case from the Becket Foundation for Religious Liberty which says that the District Court should not have characterized your status as a charitable trustee, that that came very close to infringing on First Amendment interests. And so my question is whether your concession is simply for purposes of this appeal or whether it is the independent position of your client that that is your status vis-a-vis both the synagogue and the rimonim. Your Honor, we will respond by letter. I will say that from day one of the trial below, I tried to articulate to the District Court that the tags, the tickets, the nomenclature that was being used didn't always fit perfectly because the relationships, these juridical relationships were created before some of these legal concepts, and we were concerned about having the legal concept sort of wag the entire dog. There's no question, however, about the facts. The parties, CJI and the New York Congregation, in 1903, when CJI lost a federal court case, surrendered the premises, and the first legal question is, did these two parties have the authority to enter into a settlement agreement, and should the court now respect that settlement agreement and enforce it, rather than saying, well, because they're religious institutions, we can overlook this a little bit. The language of the settlement agreement followed a stipulation where CJI declared without qualification title in Sheriff Israel and directed the absolute surrender of the premises and the paraphernalia. The paraphernalia included the remunim. They were there at the time. The only reason CJI ever had access, ever had possession of those remunim, was because they were part and parcel of the religious service, and Sheriff Israel's position was, first of all, there's a mixed pair up there, and to us, it didn't matter if they owned them, we owned them, whoever owned them, the parties were agreeing that so long as there was a cathedral there where Jewish services were being carried out, those finials would be part of it, and CJI agreed with that, and in a formal, valid, legal, binding, recorded indenture with lease, they said that the premises and the paraphernalia were being encumbered, and that failure to honor that encumbrance should lead to the eviction, not of the Jews of Newport. For 200 years, Your Honor, Sheriff Israel has been protecting the rights of Jews to every which way that we want this open to all Jews, even the district court, in finding fault with Sheriff Israel, twice acknowledged that what Sheriff Israel wants is for this synagogue to be open to all Jews at the end of the 19th century when the congregations in Rhode Island were fighting with each other and excluding each other, Sheriff Israel stepped in, we said no, we said we're only going to allow this place to continue as is if everyone is allowed, CJI wanting to be the caretaker, wanting to be the congregation that was going to stay, agreed that it would encumber the place and the paraphernalia, and the first legal error of the district court that I wish to call to this court's attention is he never interpreted those words. He should have enforced those words. We cited cases from that time period, everyone knew what paraphernalia meant when you were dealing with a religious institution, there was press, the press knew it, everybody seemed to know what the word paraphernalia meant, CJI also knew what paraphernalia meant because in their board resolution of February 2nd, 1903, they used the language agreeing to surrender the possession of the building, the premises and the paraphernalia, and then there was a public surrender ceremony, the building was locked, CJI had no access to the cathedral, had no access to the remodeling inside, it acknowledged that it was taking it back pursuant to a lease for which Sheriff Israel charged a nominal amount of $1, we're not going to make money on this venture, and the district court erred by not interpreting and enforcing that language. If I can go back to the Beckett Fund brief, they say that they're not going to enforce that. While you are focusing on language about ownership and surrender and lease, they also say that the language consistently says that the parties agree to follow your client's ritual practices, and they would like us to decide this case on that narrow basis. I take it you have chosen an alternate path that relies on the ownership type language that you've just highlighted, or have I interrupted you prematurely and you were going to get to that path? I thought our position with respect to paraphernalia was an easier ground since the district court refused to interpret it. The district court said that Sheriff Israel understood that to mean the personal property. But you don't want us to send it back for interpretation, you want us to interpret it. Yes, Your Honor. Our second assignment that we will err. They argue, look, that was a long time ago. It's not even clear the dollar for the lease has been paid since the 1950s, and there's been a degree of independence in the district courts since then. So, I mean, this is implicit in their argument. So it would be a mistake to rely on the documents from the beginning of the 20th century. Could you address that? Yes, Your Honor, and I would like to address the Beckett Fund's position. It is exactly the same as ours. I think it's another legal error. The ritual, the mode of ritual has been in this relationship since the beginning. We have been a benevolent landlord. Some people up there over the decades think we do too much, and some think we do too little. We step in when there are ritual issues to be addressed. Selling the rimonim is a ritual violation. They agreed, not as a matter of religion, but as a matter of fact, to follow the rites, rituals, and customs of Sheriff Israel in New York, and that is the same ritual as the colonial Toro Synagogue followed, and that prohibits the sale of these. The district court wouldn't allow us to put that proof on, fearing opening a Pandora's box. So when the people there wanted to use the burial spot, the cemetery, in a way that was inconsistent with the rites, rituals, and customs, the practices of Sheriff Israel, we put a stop to it. We said, no, they acquiesced. They wanted in 1905 and 1911, they wanted to add to the Toro edifice, to the cathedral. We said no, and they acquiesced. Throughout the period when there have been major issues, and we have had to say that's not our practice, they have acquiesced up until the sale of these rimonim, and we do assign clear legal error in the district courts refusing to enforce the language in that valid legal and binding indenture. Your Honor, the... When you say that, do you mean enforce the language which could only be enforced by an interpretation of Sephardic doctrine? No, Your Honor. I want the court to enforce the language that the objects, as well as the cathedral, is to be used for purposes of service. Then as a factual matter, we put proof in that as a factual matter we use these rimonim and we do not sell them. That is what we want enforced. And that's a neutral principle of law that doesn't require... But I take it the basis for the enforcement you wish there is simply a power which is given to Sheriff Israel, in effect, to deal with property. I take it you're not arguing that we should enforce it because Sheriff Israel is coming to a correct doctrinal conclusion. Correct, Your Honor. It's a question of power, not doctrine. It is, Your Honor. And the valid legal and binding lease itself gives the remedy that not the Jews, but if CJI refuses to carry on that, then we should replace CJI. The place is still going to be open to all Jews. This old quarry, 1903 document, by the way, Sheriff Israel received rent from CJI in 2012. There's no doubt in the record. We have the document. It's an exhibit. In 2012, the very year they sued us, their website acknowledges that the lease remains in effect until today. So it's not a matter of, oh, it's ancient and it's old. This is about a currently valid and vital agreement. The district court's refusal to allow any form of worship to get in his way as a matter of power, his refusal to interpret that then led to the error that he made in finding that we were not proper trustees. He finds that there was no self-dealing by Sheriff Israel. He finds that we never had our hand in the till. What he says is that our insistence that Turo continue to observe the ritual practice by its colonial founders has posed legal problems that linger to this day. So he was going to get rid of those, and he did. Now the legal error there was to have found no means, no wrongdoing by Sheriff Israel sufficient to remove us as trustees. Not only does he say there's nothing in the record, the district court, he specifically found that we discharged our obligations as trustees. It sounds like you are arguing that even if he was right about their ability to sell the remining to the Museum of Fine Arts, that that is still no basis to remove you all as trustees. Is that really what you're arguing, or are you arguing there was error in that there should be no question about our status as a charitable trustee? The signal error is what Your Honor identified, and allowing them the right to sell was the principal error. If the court affirms that, Sheriff Israel still should not have been removed as trustee, and CJI should not have been appointed as trustee in a proceeding where the Attorney General wasn't the party, where there was no notice given that any of this was happening. CJI itself said that they were contemplating subsequent proceedings before any of this happened. The point I was then making, Your Honor, though, was that having found that we carried out our obligations as trustee by leasing the building to them, what he says is our single obligation is to act for the benefit of Jesuit Israel, and on that basis he said we were not a good trustee. We have no obligation singularly to act for the benefit of Jesuit Israel at all. We act for the Jews of Newport. I want to close the court with Gary Metallus for Congregation Jesuit Israel. Counsel, before you really get started, I've got a question that I kind of need you to answer. Transferring a piece of property requires a proof of ownership. In other words, for you to be able to sell what we have in front of us today, you've got to be able to show that you're entitled to be able to do that. In other words, that you own it. Do you agree that the burden of proof of showing ownership is on you? The answer is, and I can just answer it a little more lengthily, the answer is yes in part and no in part. Judge McConnell found two independent grounds for finding that we owned the remnant and that they were not part of any charitable trust. The first one of all, he found that the remnant were made for the colonial predecessor synagogue, the congregation perennial synagogue, Jesuit Israel. That was an issue that they challenged below and he found that. He found two things. One, that they were made for that congregation and two, that your group is the successor to that. The second part of that, Judge, actually just to put a nuance on your point, which is he found that the only reason these remnant ever came into the possession of Sheriff Israel for a small period of time in the 19th century is when the Jews left Newport, the synagogue was shuttered, they were given to them in safekeeping to be re-delivered to the congregation here and after reigning in the synagogue. He found that to be a bailment through the use of the word safekeeping, re-delivery, but also from the fact that Sheriff Israel treated it as a bailment, which is to say they put the words Newport on the sides of the building that were there and also they re-delivered it. Why does any of that matter in light of the 20th century documents showing a settlement between the parties? And that's where I'm having problems reading the 1903 decision. Well, the reason that matters is twofold. First, there's a lot of other 20th century evidence which goes the other way based upon the presumption of ownership. No, the presumption of ownership doesn't apply if you've got documentary evidence that describes the relationship between the parties. So, although they didn't get into this, I don't see how the presumption of ownership either applied here or was sufficient in light of the later documentation. Well, the presumption of ownership, Your Honor, occurs... From possession. Yes, and from conduct on both parties' side. Beginning in 1903, we've held ourselves out publicly and repeatedly for 113 years, 14 years as the owners. Then why have you been paying a leasehold dollar? That was for the synagogue, not for the women in it. But your answer assumes that the personal property, which was referred to in general terms, is not subject to the same ownership documentation as the building itself. And yes, there are factual findings on that which most respectfully are in no way clearly erroneous. The factual findings are they contested there was a trust below. They've obviously given that up on appeal. The trust comes from the will of Jacob Rodriguez Rivera of 1787 and admissions by Sheriff Israel over the years of the trust. And although I doubt, most respectfully, Justice Souter, the reason for the trust was not having to do with personality. It had to do with the fact that in the 18th century, a religious institution could not own land or a building. That is why when the synagogue was built, it was placed in the and Rodriguez Rivera as trustees. And in Rodriguez Rivera's will of 1787, he makes plain, we aren't the owners of this. We don't have equitable title. We're only holding this as trustees. And indeed, all the documentation over the years indicated that the synagogue was held in trust, period. That is lying. Why do we have to go back to that in view of the 1903 agreement, the 1945 agreement with the feds, and I think a subsequent historic preservation agreement? Why are they not, in effect, superseding documents, simply expressions of civil law contract agreement that should govern this case? Well, in no way, most respectfully, Justice Souter, do they supersede anything. It's just as Judge McConnell found, let's talk about this lease, which is a lease of real property on a real property form book. You can't lease or sell what you don't own. I think that's a fundamental principle of law. He made an absolute factual finding that there was no evidence that Sheriff Israel ever owned the ruminine at any time, any place, anywhere. Now, let's go back to Judge Baldock's question. What this case is about is whether your client may sell the ruminine. And to talk about their burdens or what relationships they had strikes me as being largely beside the point, especially when we have this 20th century documentation. And you keep going back to history, but we're dubious that it has anything to do with this case. So let's go back to how do you show your burden that you are the owners of this property other than history? Well, we have two grounds, Your Honor. The factual findings by Judge McConnell of a bailment where the property was ruminine were not delivered to us, and we think those findings are clear and not clearly erroneous, and they've done nothing to discredit those findings. Even now, the 20th century documents do not talk in terms of bailment at all. But the 20th century documents, the longest 20th century document they talk about is a settlement agreement, period. After the federal court rejected your claim that you were the owners of the property at issue there. And so the parties sensibly enough reach a settlement agreement. Are you talking about the 1903 decision? Yes. Well, Judge McConnell and Wayne didn't... Yes, and let's not go there, okay? So you have the decision that sets up the parties for settlement negotiations. They reach a settlement that regardless of whether there was a bailment before, it now is an agreement between the two congregations as to how this property is going to be treated. And the settlement involves a lease. And why, to go back to Justice Souter's question, why if the lease is irrelevant did your clients make payments all those years under the lease? They made one payment in the last 20 years, but number one, the lease doesn't cover the remuneration. The lease covers the synagogue, period. The settlement agreement, neither the settlement agreement nor the lease effectuating the settlement agreement ever has the word remuneration in there. No, it has appurtenances and paraphernalia. It doesn't have personal property, it doesn't have personal... What could paraphernalia possibly refer to if it is not personal property? Well, if you look first at the settlement agreement, which is Appendix 1888, it doesn't have the word paraphernalia in there. It has the word fixtures in there. It says building premises and fixtures. That's what the settlement agreement says at Appendix 1888. And the lease was effectuating the settlement agreement. The word paraphernalia, the word remuneration doesn't appear in there. The word personal property doesn't appear in there. And fixtures are clearly things that are attached to the will. The authorizing vote for the lease says these trustees are authorized and directed to surrender the possession of the synagogue building, premises, and paraphernalia belonging thereto to the other congregation. We would suggest, Judge Lynch, that paraphernalia there was used as a synonym for fixtures, period. It was not used for ruling. And really, since they drafted the lease, and other people will settle you on Rhode Island and elsewhere, and ambiguities are construed against the should have said it. It shouldn't be under some nomenclature under fixtures. The indenture uses the language about appointments and paraphernalia. It doesn't say remuneration, Judge. It doesn't say personal property. And so a civil court interpreting the language of the parties is precluded from finding, is required to find that the remunerant are not part of apprentices or paraphernalia. Well, no, they're not precluded from finding that. But I would say three things to that. One, there is a factual finding that in drafting this lease, the judge found, as a matter of fact, and it's not clearly erroneous, that it was not the intent of Jesuit Israel to include the word mean in the lease. That's the first thing. That's a specific factual finding, which is not clearly erroneous. And secondly, with all respect, I go back to a broader point. I could enter into a lease with Your Honor and say, I lease Fenway Park to you. But if, in fact, I don't own Fenway Park, that doesn't mean anything. And I think that's just a matter of principle of law. And I think, most respectfully, with Your Honor, I think there's a lot more, also, to the presumption argument. And if I might, most respectfully, try and spell it out a little bit. Because the burden, once there's a presumption of possession, the burden, a presumption of ownership from possession, the burden would have to shift back. The burden shifts to them to rebut the presumption. And going back, in answer to the very first question from Judge Balogh, all the history over the last hundred years are consistent with us being the owner and inconsistent with them being the owner. Because how people behave under a contract or a lease is some evidence of what it means. That goes to the list. And we've held ourselves out as the owner. They have never objected. The 2001 federal agreement, the Historic Site Operating Agreement, says, whereas the Toro Synagogue is an active place of worship of the congregation, Jesuit Israel, which has possession of the site through a lease with congregation Sharia Israel as owner. And that's only about the building. It doesn't say anything about the revenue in there. In the 45 agreement at all. All right. Could you address the separate argument made about the Beckett brief's suggestion that the narrowest possible decision has to do with the agreement that the paraphernalia and the rest would be used in accordance with the religious practices of the New York congregation? Well, first, the whole religious issue, which is both their issue and the Beckett brief's issue, first, in the lease and in the 45 agreement, there is a reference to how services are to be conducted. Consistent with this Spanish and Portuguese tradition. That is to say, with prayers, etc. There's nothing in there in any way, shape, or form, which has anything in the world to do with what one does with one's personal property. Secondly, with respect to the issue of services, they're fully aware of how Jesuit Israelis pray for 100 years there. And indeed, their only live witness said that we have no problems with how they pray there. Indeed, it sounds pretty familiar to us. And indeed, for 100 years they've indicated they know how we pray and have no problems with it. Whether it is precisely the same, whether prayer A follows prayer B or prayer C. Secondly, the issue of interpretive, Judge McConnell, I think quite properly, kept the issue of their attempt to say, well gee, they may be right under property law, but under religious law, that shouldn't be the case. That's an Establishment Clause issue. I'm sorry, I thought their argument or the argument of the brief was that your congregation had agreed to a certain religious practice and according to that religious practice that there was no real dispute, you could not sell the remand. Are you saying there is a factual dispute about what their religious practice is? Yes, number one, we didn't agree to any religious practice that precluded us from selling the remand. Two, we do not agree, even though it's clear, it's on the record, that if the judge would allow any evidence about what their Sephardic religious beliefs were about selling property or not selling property, that we disagreed with that as a factual matter and would have contested it. Indeed, when they attempted in the middle of the trial to put on this rabbi to testify to it, we indicated we would have contested it and it shouldn't be allowed because he was an expert witness who hadn't been fairly disclosed and that's why he was precluded. But no, I think that it is plainly a factual issue. We do not in any way, shape or form agree that Jewish law prohibits us from selling this and nor do we believe it's in any way applicable to this case, which is a matter of Rhode Island property and trust law or federal law to the extent federal law applies, but it's a matter of secular law in this case. And I should say, one thing, a couple of things in response to a couple of things that they raised, one of which meant they take the position before this court that the remedy were part and parcel of the synagogue and they have to be there all the time and so on. You know, in their own complaint in the Torah, and we couldn't have the Torah synagogue without the remedy being there, in their complaint and counterclaim here, they asked for possession of the remedy and for it to be shipped to New York. Number one. Most of the time, these remodelers were out on loan to various museums and educational institutions around the country. For example, they were out at Yale, they were out at, in fact, they have not been on the premises of the Torah synagogue for the last seven years because they've been on loan at a prominent exhibit at the Museum of Fine Arts in Boston. They've been on loan to the Smithsonian, they've been on loan at different times to the Jewish Museum. And even when they are back on the premise, even when they're not, when this handful of times they're not out on loan, they're kept in a safe deposit box. They're not used as part of the, because they're too fragile and the like. And also they have multiple sets of remedy, including multiple sets of Meir Meir's remedy. So this construct, which is inconsistent with their pleadings that somehow the Torah synagogue could not go on without the remedy, is quite beside the point. Certainly I should. Sorry, your time is up. Thank you. Thank you. Your Honor, page 89, note 69 of the district court opinion. The district court does not find that CJI is a successor. He specifically does not make that finding. The 1945 agreement with the federal government, like the 2001 agreement, doesn't talk about modality of religious belief, but about use. About how religious articles are used. Sheriff Israel also loans its property out for educational and other illamasinary reasons. That's a far cry from selling them so that they're never then again part of this Jewish heritage that the district court finds they have been a part of for 250 years. In the 2001 agreement, the counsel may have misspoken, there is specific reference, not just to the property, but to protecting and conserving the related collections. And at trial they admitted that the related collections include the Rimonim. The court already saw that the form book lease was not a form book lease at all. The word paraphernalia was specifically written in. And the district court never found as a fact that CJI did not intend to include personality. What he says is that there is no evidence of its intent. But there was evidence of Sheriff Israel's intent, even if the court were to go beyond the plain language of the agreement. It says paraphernalia. We cited the cases from that period. I think everybody knows what paraphernalia means. If the court wished to go beyond that and look at intent, Sheriff Israel's intent was very clear. There was a dispute in 1902 and 1903. The parties resolved it. So if there was a dispute about Fenway Park and two parties decided that they were going to enter into a settlement agreement to say, I don't know who owns it, but I'm telling you it's part of this deal, we're going to keep it as part of it, that should be respected by the courts and that should be enforced by the courts. It doesn't have anything to do with what religious background or religious law is behind it. The question is not, what does Sheriff Israel believe? The question was always, how did Sheriff Israel act? And on that, my brother was wrong again because there was unrebutted evidence, both by Mr. Katz, we cite this in section F of our brief at page 23, of the unrebutted evidence that the affirmative covenant about how the religious article should be used as part of the service was used, not used haphazardly and not put them in harm's way and put them in a vault if you need to. No one knew the value of these, by the way. It wasn't the one valuable thing in 1903. And they knew that they were religious articles and they weren't going to be sold. And so the idea of putting a value on them was as foreign to those people as it should be to us today. When Rabbi Soloveitchik was foreclosed from testifying, he was not going to testify as an expert. He was going to testify to the fact of how the remunim are used. And he was precluded from doing that. The closing counsel said he was precluded because he hadn't been disclosed. Right. And what we said to the judge is we're calling him as a fact witness and he had been disclosed as a fact witness, not as an expert. We were not trying to prove religious law. We were trying to prove what the Sheriff Israel do. Are we going to be able to see from the record that he was not precluded from testifying because he was not disclosed but for the reason that you're stating? Yes, Your Honor. There is an order that we put into the appendix where the judge says I'm worried about opening Pandora's box and so he wouldn't let him. Thank you. I must say the high quality of advocacy from both sides in this case has been demonstrated and we're very appreciative. Thank you.